MILLER, Presiding Judge pro tem.
This suit by guest passengers for personal injuries and resulting expenses arose out of an intersectional collision which occurred at approximately 10:20 p. m. on July 12, 1958, within the city limits of Gonzales, Louisiana, at the intersection of Burnside Street (Louisiana Highway Number 44) and the Airline Highway (U. S. Highway Number 61), each of which is hereinafter respectively referred to simply as Burnside Street and Airline Highway. George Walker seeks damages for his own personal injuries plus his and his wife’s medical expenses. Mrs. Olive Downing Walker, who divorced her husband subsequent to the filing of this suit but prior to the trial, seeks damages for her own personal injuries. The named defendants were (1) Mr. Paul S. Foster, the owner and driver of the 1957 Cadillac in which the plaintiffs were riding and its insurer (2) Home Indemnity Company; Messrs. (3) Alvin Millet and (4) Henry DeLatte, d/b/a Gonzales Memorial Company, owner of the 1949 truck which was operated by their employee David LeBeau and insured by defendant (5) State Farm Mutual Automobile Insurance Company.
The trial court rendered judgment in favor of Mr. Walker in the amount of $3,806.37 for special damages, only $65.00 of which was for Mr. Walker’s medical expenses, together with the sum of $800.00 *687 for his personal injuries, and in favor of Mrs. Walker in the sum of $10,500.00 with interest and costs against the defendant State Farm Mutual Insurance Company and dismissed the suit against Home Indemnity Company, Paul S. Foster and Alvin Millet and Henry DeLatte. Judgment was signed accordingly and the plaintiffs herein appealed, complaining that the award of damages was manifestly inadequate. State Farm Mutual Automobile Insurance Company (hereinafter referred to as State Farm) also appealed and in its specification of errors set forth that:
“1. The District Court erred in failing to find that the LeBeau vehicle had pre-empted the intersection and thereby was entitled to the right-of-way over the Foster vehicle.
“2. The District Court erred in failing to apply the doctrine of last clear chance inasmuch as the evidence shows that, although LeBeau might have placed himself in a position of danger, Foster, nevertheless, had the last clear chance to avoid the accident, had be been driving at a reasonable and proper speed and keeping a proper lookout.
“3. The District Court erred in refusing to apply speed and stopping distance tables and charts in judging Foster’s actions. * * * The reason given by the District Court for not accepting the results of the tabulation is not a valid reason and amounts to an arbitrary rejection of accepted and frequently applied principles.
“4. Alternatively the District Court erred in failing to find that Foster and LeBeau were joint tort feasors, and in dismissing the suit against Home Indemnity Company, Foster’s insurer, since the evidence shows that excessive speed and failure to keep a lookout on the part of Foster were each and both a proximate cause of the accident.
“5. The awards made by the District Court to the plaintiffs are excessive and should be reduced.”
There was no appeal from the holding of the trial court that Dave J. LeBeau had borrowed the truck from his employers, Alvin Millet and Henry DeLatte, and was not acting in the course and scope of his employment. Therefore, LeBeau’s employers were not liable for any of the damages or injuries. Since LeBeau had permission from his employers to use the truck, it was conceded that the liability insurer of the 1949 truck will be properly cast in judgment if LeBeau had been negligent.
At the site of the accident, Airline Highway provides dual opposing lanes separated by a neutral ground for northwest and southeast bound traffic, while Burnside Street provides only two lanes of blacktop for north and south bound motorists. Traffic at this intersection is regulated by a stop sign and a flashing red signal light requiring vehicles on Burnside Street to stop before entering the intersection, and a flashing yellow signal light which warns traffic on Airline Highway of the existence of the intersection. Although there is no specific testimony on the point it is presumed that the intersection was well lighted, for both parties saw the other for some time before the accident. The weather was clear and the road was dry.
The plaintiffs, Mr. and Mrs. Walker, were passengers in the 1957 Cadillac sedan owned and operated by Mr. Paul S. Foster while he was proceeding in a southeasterly direction on the Airline Highway from Baton Rouge toward the intersection with Burnside Street. At this same time, the 1949 Chevrolet truck driven by Dave J. LeBeau, was approaching the intersection heading south on Burnside Street from the left of the Foster vehicle. Mr. LeBeau came to a stop before entering the intersection, then proceeded across the two lanes which car *688 ried traffic in a northwesterly direction and again came to a stop at the neutral ground which divided the dual lanes of the Airline Highway. When LeBeau estimated that the headlights of the approaching Foster vehicle were approximately one or one and a half blocks away, he concluded that he had sufficient time to safely cross the intersection ahead of the Foster vehicle and started south across the dual lanes which carried southeasterly bound traffic on the Airline Highway. Mr. Foster saw LeBeau stopped at the neutral ground and sounded his horn when he was approximately 1000 feet from the intersection to warn LeBeau of his approach. Foster was then in the inside or left lane and changed over to the outside or right lane in order to allow more room for his passage in front of the truck. When LeBeau started into the intersection of the second dual lanes, Foster then applied his brakes and sounded his horn continuously until the collision. He concluded that he could not go behind LeBeau, so at the last moment before the collision Foster tried to turn onto Burnside Street by turning 45 degrees to the right so that he could parallel LeBeau’s vehicle without hitting it. Foster succeeded in turning to the right approximately 30 degrees when his left front fender truck LeBeau’s right front fender which in turn caused the left side of Foster’s vehicle to strike the right side of LeBeau’s vehicle and bounce back such that the Foster vehicle came to rest facing southeasterly at a point approximately seven feet south of the point of impact. LeBeau’s truck continued south on Burnside Street a distance • of from one to two hundred feet before Le-Beau brought the truck to a stop. The first impact between the car and the truck occurred on Airline Highway but only about two feet east of the western edge of the Airline Highway and in the extreme northwest corner of the intersection.
It is State Farm’s view of the evidence that the record will show that Foster was speeding and that LeBeau would have had ample tims to cross the intersection except for Foster’s high rate of speed. Although there has been no ordinance or statute called to our attention setting forth the speed limit which applied to Foster’s vehicle, the hearsay evidence would indicate that Foster had the right to travel on the Airline Highway within the City Limits of Gonzales at least 45 miles per hour. The trial court was most impressed with the testimony of Mr. Foster who concluded that he was driving between 40 and 45 miles per hour at the time that LeBeau started across the second dual lanes of the intersection. LeBeau had no idea as to the rate of speed at which the Foster vehicle was approaching, as indicated by his testimony:
“A. I don’t know what speed he had but he was coming pretty fast.
“Q. Well, would you say forty-five miles an hour?
“A. No, I wouldn’t say what he was coming.
“Q. You wouldn’t say he was going faster than that, would you?
“A. I wouldn’t say he was going anything because I wouldn’t know how fast he was going.”
LeBeau vacillated concerning his version of how far the Foster vehicle was from the intersection when LeBeau started across the second dual lanes. On several occasions he testified that the Foster car was from a block to a block and a half away when he started across the second dual lanes. However he approximated the distance of a block as being about 200 feet. On cross-examination when he was reminded that he had given a statement to an insurance adjustex-, he then testified that:
“Q. How far was the car, Cadillac, from the intersection when you pulled out?
*689 “A. He was inside a block, not too much inside this block when I pulled out the section in the neutral ground.
“Q. He was within a block from you?
“A. Maybe a little bit better than a block. You couldn’t see hardly anything. It was dark and you could just see his car light. That’s all you could see.
“Q. Awhile ago you said a block and a half and now you said a block.
“A. This was when I started off. I told you when I started, came across and I stopped and I looked and I went on.
“Q. I’m talking about when you started off the last time. Was he about a block away from you then?
“A. Well, I wouldn’t say so because you can’t judge a block at night like this.”
All of the passengers in the Foster vehicle including George Walker agreed that Mr. Foster was driving in a careful manner. The only one to suggest that Foster was exceeding 45 miles per hour at the time that LeBeau pulled out into the intersection, was Mr. George Walker. We agree with the holding of the trial judge that the preponderance of the evidence is that Foster was not traveling at an excessive rate of speed at the time LeBeau decided to enter the intersection.
State Farm’s argument is based on the premise that Foster was at least 200 feet from the intersection at the time the Le-Beau vehicle began its entry into the second dual lanes of the intersection. From this, it is submitted by State Farm that the speed and stopping tables and charts require a holding that Foster was traveling faster than 55 miles per hour. This argument fails for the reason that the evidence does not preponderate in favor of a holding that Foster was at least 200 feet from the intersection when LeBeau entered the intersection. LeBeau’s testimony quoted hereinabove does not establish State Farm’s premise. Neither does that of Mrs. LeBeau who was riding in the truck with her husband. She testified on direct that:
“Q. About how far did it seem to you that the car was?
“A. Every bit of a block.
‡ %
“Q. What made you feel that you could make it this time?
“A. If he would have not been coming too fast I might could have made it.
“Q. Did it seem to you that this car was coming faster than cars usually come?
“A. I can’t tell you.”
Mrs. LeBeau was not cross-examined.
All of the estimates of distance were given without the benefit of an actual measurement. There was no test given to the witnesses to check their estimates of distance. Mr. Foster testified on several occasions that he would estimate that he was an absolute maximum of 200 feet from the intersection when LeBeau started into the intersection, and that his best estimate of the minimum distance from the intersection was 150 feet. However on cross-examination he testified:
“Q. About how far were you from the intersection when you saw him start across ?
“A. From a maximum of two hundred feet and possibly as little as a hundred feet. As I say, that is an estimate, I couldn’t say exactly.
“Q. Now, at that time, did you consider the feasibility of going behind him?
*690 “Q. It would have been practically impossible because of the length of the vehicle. I mean, it would have been much easier to have turned right and try to get into the street before he did as (it would have been) to turn to the left because, again, the highway is at an angle and I couldn’t possibly have missed him by trying to turn left and going behind him.”
Mr. George Walker, plaintiff, testified on direct:
“Q. Approximately how far would you estimate the Foster vehicle was from the other vehicle at that timi (when the LeBeau vehicle started into the intersection) or could you estimate ?
“A. Well, I could only guess. I’d say a hundred and fifty or two hundred feet.
“Q. And that’s when he started out, is that right?
“A. Yes.”
And on cross-examination, Mr. Walker testified:
“Q. Do you know how fast the truck was going ?
“A. No sir, I’d say probably two or three miles an hour.
“Q. That’s all?
“A. Yes sir.
“Q. Did you know that there was going to be a wreck? When did you know there was going to be a wreck?
“A. Well, of course, I didn’t know whether Mr. Foster was going to be able to maneuver his car around the corner and miss him or not. I didn’t know actually whether there was going to be a wreck or not until it happened, but I could see that he was going to have to do some mighty good manuevering to keep from having the wreck.
“Q. But he was, Mr. Foster was pretty close to that intersection when that truck pulled out in front of him, wasn’t he?
“A. Yes.”
And again on cross-examination, Mr Walker testified:
“Q. Are you fairly positive that the car had made a substantial turn to the right before the first impact?
“A. I would say that he was cutting to the right in an effort to avoid striking the truck and I think that he was doing a good job of it. Had the truck slowed down or stopped the impact wouldn’t have happened.”
We are in complete agreement with the finding of the trial court that the sole proximate cause of this accident was the negligence of LeBeau in entering the intersection from the unfavored street at a time when Foster who was on the favored street had the right of way. As stated in the case of Arline v. Alexander, La. App., 2 So.2d 710:
“To stop before entering a right-of-way street but discharges half the duty upon a motorist. This action must be followed by careful observance of traffic conditions on the right-of-way streets and no entry thereon made unless conditions clearly warrant it.”
We conclude that LeBeau did not pre-empt this intersection, for as stated in Butler v. O’Neal, La.App., 26 So.2d 753, 756:
“Pre-emption of an intersection, under the principles established by our jurisprudence, does not mean the prior entry of a vehicle simply by a matter of a few feet, or, in relation to the time element, by a fraction of a second ahead of another vehicle, but, in order to support a charge of negligence, such pre-emption must be *691 construed to mean an entry into an intersection with the opportunity of clearing the same without obstruction of the path of another vehicle under normal and reasonable circumstances and conditions. Where the intersection involves the passage across a favored thoroughfare, an obligation of unusual care and caution upon the driver of vehicles on the less favored thoroughfare should be enforced.”
The case of Wilson v. Williams, La. App., 82 So.2d 71, which is the principal case relied on by State Farm, is distinguished from the instant case in that there the vehicle on the favored street was traveling “greatly in excess of 40 m. p. h.” in a 25 m. p. h. zone, whereas here the vehicle on the favored street was not exceeding the speed limit. The case of Gauthier v. Fogleman, La.App., 50 So.2d 321, is not applicable for the same reason.
State Farm contends that even though LeBeau be found negligent, we should find that Foster had the last clear chance to avoid the accident and therefore Home Indemnity Company should be cast in judgment. State Farm likens this case to Gallioto v. Chisholm, La.App., 126 So.2d 63, where the doctrine of last clear chance was applied and the negligent party crossing the favored street was allowed to recover. In the Gallioto case the driver on the favored street did not see the crossing vehicle until he was about 10 to 20 feet from the intersection, and the vehicle on the unfavored street had entered the intersection while the favored vehicle was approximately three-quarters of a block away. In the instant case, Foster saw the LeBeau truck the moment LeBeau started into the intersection and Foster immediately took every possible evasive maneuver to avoid the accident. The doctrine of last clear chance does not apply under these circumstances. See Romans v. New Amsterdam Casualty Co. (No. 5463 on the docket of this Court) 137 So.2d 82, which involves a left turning vehicle, but nevertheless sets forth a discussion of the doctrine of last clear chance which is apposite to this case.
Both parties have appealed from the award of damages by the trial judge, State Farm contending that the awards for personal injuries are excessive and should be reduced, and the plaintiffs contend that the awards for personal injuries are manifestly inadequate and should be increased. Neither party complains about the award for the special damages.
 Mr. George Walker was not confined to the hospital although his physician Dr. Joseph Sabatier, was of the opinion that he should be hospitalized. Although Mr. Walker did not receive any fractures, the x-rays taken immediately after the accident showed a congenital defect in his low back which made him more susceptible to injury. M-r. Walker complained of pain for about four months after the accident but did not consult Dr. Sabatier at his office after July 22nd, the accident having occurred on July 12th. Mr. Walker made his complaints to Dr. Sabatier during Dr. Sabatier’s visits to Mrs. Walker at the hospital. According to Dr. Sabatier most people troubled with the same injury suffered by Mr. Walker would spend some time in the hospital. The fact that Mr. Walker’s business obligations would not permit him to submit to conservative treatment in the hospital cannot be cause to reduce the amount of his claim. Although Mr. Walker did not visit Dr. Sabatier in his office after July 22nd, Dr. Sabatier did not discharge Mr. Walker from his care, and the Doctor confirmed the fact that Walker did complain to him during the Doctor’s visits to Mrs. Walker at the hospital. With these findings we cannot conclude that the trial court’s award to Mr. Walker of $800.00 for personal injuries is either manifestly inadequate or excessive.
Mrs. Olive Downing Walker suffered serious and complicated injuries. Examination and x-ray studies made in the emergency room of the Baton Rouge Gen *692 eral Hospital showed that Mrs. Walker suffered a laceration of the scalp, the fracture of her left second and third ribs, together with muliple fractures of the pelvis. The laceration of the scalp was in the right frontal region about two and one-half to three inches long, and required sutures to close. Mrs. Walker was confined to the hospital from July 12th, 1958 through September 7, 1958 excepting for a few days when she unsuccessfully tried to get along at home. Dr. Sabatier testified that her injuries were extremely painful and caused her a great deal of discomfort. However, as of December, 1958, Mrs. Walker had recovered from all except her pelvis and back injuries, and Dr. Sabatier then referred Mrs. Walker to Dr. Moss Banner-man, an orthopedic surgeon of Baton Rouge, Louisiana. At that time Mrs. Walker was still unable to walk without the use of a walker or crutches. Dr. Bannerman testified that it was necessary for him to perform an operation in March of 1959 to fuse the sacroiliac joint. According to Dr. Bannerman all of this was extremely painful and as of April 2, 1960, Mrs. Walker was still having discomfort and would continue to have discomfort, particularly when pressure was applied to the area of the sacroiliac joint. Mrs. Walker was confined to the hospital for two weeks commencing March 17, 1959 for the operation. After her release Mrs. Walker was unable to walk without a walker or crutches until June of 1959. Twenty months after the accident, she was still suffering and under the care of an orthopedic surgeon. Even though Dr. Bannerman was of the opinion that Mrs. Walker would suffer some pain for a prolonged recovery period, he testified that:
“As far as I can see no permanent disability. The only thing that I anticipate as mentioned previously is that she will probably have a painful area over the left hip for some time in the future. I see no reason, and on this we have checked rather carefully the hip joint itself because it was close to that area but over the serial pictures made on her for a period of approximately a year and a half, I see no evidence of any other damage which would be apt to cause her additional disability in the future.
“Q. In your opinion, is she in as good a condition now as she was prior to the accident?
“A. Technically, no, practically, yes.”
To assist us in determining the proper award for Mrs. Walker’s injuries, State Farm has cited the cases of Wilson v. Williams, La.App., 82 So.2d 71, Mire v. St. Paul Mercury Indemnity Company, La. App., 103 So.2d 553, and Winn v. Yellow Cab Co., La.App., 96 So.2d 365. In the Wilson case, an ■ award of $7,500.00 was made to a plaintiff who sustained similar injuries, but was able to walk without crutches within four months and was medically discharged six months after the accident. In the Mire case, the plaintiff was awarded approximately $6,600.00 for injuries which caused her to submit to two major operations which confined her to the hospital for a total of only fifteen days and to remain bedridden for an additional thirty days. It was there noted by the appellate court that the plaintiff, after reserving its rights to seek an increase of the damages in the event of an appeal, had entered a voluntary remittitur of $4,-000.00 after the civil jury awarded her a total of $10,000.00. The injuries suffered by Mrs. Walker were more severe than those suffered by the plaintiffs in the Wilson and Mire cases.
From a reading of the decision in the Winn case, supra, where a civil jury award of $6,000.00 was increased to $10,-000.00, it would appear that the injuries suffered by the plaintiff are comparable to those suffered by Mrs. Walker. Thus the case was properly cited as relevant to the damages which should be awarded in this case. However, we base this con- *693 elusion only on a reading of the opinion and not of the evidence tendered therein. From a reading of the evidence in this case, we are satisfied that because of the severe injuries, great amount of pain and suffering, that a larger award is warranted.
We are of the opinion that the award of $10,500.00 to Mrs. Walker was inconsistent with the serious nature of the injuries and resulting pain and suffering hereinabove described, and that the award should be increased to the sum of $15,000-00.
For these reasons, the award of damages to Mrs. Olive Downing Walker is increased from $10,500.00 to the sum of $15,000.00 and in all other respects the judgment of the district court is affirmed, costs to be paid by defendant-appellant.
Amended and affirmed.